ERNEST F. MILLAR, appellant,

v.

FIDELITY TRUST COMPANY, executor, &c., respondent.

[Decided January 25th, 1924.]

On appeal from a decree of the court of chancery advised by Vice-Chancellor Fielder, who filed the following opinion:

"Complainant claims that he and Frederick W. Egner were interested (a) jointly as endorsers on promissory notes made by the Millar Supply Company, which notes were discounted by them and the proceeds used for their joint benefit; (b) as partners in a loan account with the Fidelity Trust Company on complainant's promissory notes and in the stocks pledged as collateral on such loan; (c) as joint adventurers in certain stock transactions, unsettled at Egner's death. He seeks by this suit to establish his three claims and to have an account taken of their joint dealings, to the end that it may be determined what he and the defendant, who is executor of Egner's will, owe each other. During the period covered by the alleged dealings, complainant was a stock broker and Egner was a vice-president of Fidelity Trust Company. They were close friends. There was no written agreement between them covering the matters in controversy and because of the provisions of section 4 of the Evidence act (*Comp. Stat. p. 2218*), complainant was barred from testifying as to his transactions with and as to statments made to him by Egner. No witness was called on behalf of defendant and the proof of complainant's claim must be found in the evidence of witnesses produced and exhibits offered by him.

"The proofs show and the parties admit that the Millar Supply Company was a dummy corporation, controlled by

complainant and Egner and used by them for the purpose of raising money on promissory notes made by the corporation, endorsed by complainant and Egner and discounted by them at various banks, and that the proceeds of the discount were used by them jointly for some purpose of their own. The evidence shows that on September 27th, 1919, such notes outstanding amounted to $11,250 and that complainant has since paid $400 on some of them. As to what disposition has been made of the balance of the notes, the evidence is silent. Complainant and Egner were jointly liable to pay these notes, as between themselves, and an account should be taken before a special master, to ascertain what sums have been paid by them, or by the defendant, in discharge of the notes and how much is due from or to complainant.

"The proofs also show, and the parties admit, that the loan or loans made by Fidelity Trust Company on a promissory note or notes secured by stock collateral, although the notes were made by and the collateral stood in the name of complainant alone, were joint transactions in which complainant and Egner were engaged and that the obligation to pay the loan and the ownership of the collateral were, as between complainant and Egner, joint. The account to be taken by the master should include this item also and a balance should be struck for the purpose of ascertaining the amount due as between complainant and defendant. Complainant urges that in stating the account on this loan, the value of the securities held as collateral, should be taken as of the highest price at which they have sold since Egner's death, apparently for the purpose of deducting the amount due on the loan from such value and crediting complainant, as against defendant, with one-half of the difference, it being complainant's argument that defendant, up to the time of final hearing, disclaimed any interest in the loan account or in the securities pledged therewith, but now admits it; that such disclaimer prevented complainant from selling the securities at the highest price which might have been obtained therefor and from paying off the loan and thus the loss or profit on the account, as the case may be, is materially changed. It

appears to me that when Egner died the joint transaction was at an end and it remained only to sell the securities pledged with the Fidelity Trust Company, pay the loan out of the proceeds and state an account. In the joint transaction the responsibility and duty to act were as much complainant's as defendant's and since the securities stood in the name of complainant it was his duty to sell them at the best price he could get, and after defendant had rejected his claim and disclaimed interest in the securities complainant was at liberty to sell them and close the account. The most that could have been required of complainant on a sale would have been good faith and a proper degree of prudence. I think that complainant should now direct the Fidelity Trust Company to sell the securities or such of them as remain pledged with it and apply the proceeds in payment of the loan, holding the excess, if any, until an account is taken by the master, who shall ascertain whether there is profit or loss on the account, the result to be balanced against the result of the accounting on the Millar Supply Company notes.

"The first joint adventure in stock transactions claimed by complainant relates to one hundred and eighteen shares of Houston Oil Company stock. It appears that complainant opened an account with the brokerage firm of Forrest, Davis & MacDonald, March 19th, 1915, in the name of 'E. F. Millar Special,' which account shows a large number of stock purchases and sales down to October 4th, 1917, when the account had to its credit ninety shares of Cuban-American Sugar and to its debit the sum of $13,345.50. It is not shown that Egner had any interest in this account. On October 4th, 1917, the brokerage firm of Clark, Dodge & Company gave its check for $13,345.50 to Forrest, Davis & MacDonald and received the ninety shares of Cuban-American Sugar. At that time Egner had an account with Clark, Dodge & Company, which account was charged with the purchase of the sugar stock at $13,345.50, Thus, on its face, the transaction appears to have been the purchase by Egner of ninety shares of Cuban-American Sugar for $13,345.50, or about 148¼ per share. Egner held this stock until April 8th, 1918, when

he sold at 143, realizing $12,855.15 net, being a loss of $490.35 on his purchase. On the same day he bought one hundred shares of Houston Oil at 44, through Clark, Dodge & Company, and $4,412.50 was charged against and the stock was credited to his account. About May 28th, 1919, the Houston Oil Company gave its stockholders the privilege of subscribing to a new stock issue at par, to the extent of seventeen and three-tenths per cent. of their holdings. At this time Egner held nine hundred or more shares of this stock in his Clark, Dodge & Company account, which gave him the right to subscribe for one hundred and fifty-five shares of the new issue. He in fact subscribed for and bought two hundred and forty-five shares at par and had them charged to his account. It is complainant's theory that with the proceeds of sale, April 8th, 1918, of ninety shares of Cuban-American Sugar, Egner bought one hundred shares of Huston Oil and that under his right to subscribe, he, on May 28th, 1919, acquired eighteen additional shares at par, thus making the one hundred and eighteen shares cost $6,-212.50. Complainant claims that these same one hundred and eighteen shares were held in Clark, Dodge & Company account at Egner's death and were thereafter delivered to defendant.

"The proof to sustain complainant's claim to an interest in the shares in question is, first, the transfer October 4th, 1917, of ninety shares of American Sugar from his account with Forrest, Davis & MacDonald to Egner's personal account with Clark, Dodge & Company, the sale of that stock April 8th, 1918, by Egner and the purchase by Egner, on the same day, of one hundred shares of Houston Oil and the addition of eighteen shares thereto in the manner above stated. Complainant argues that Houston Oil was purchased with the proceeds of his Cuban-American Sugar, and therefore he became entitled to an interest in the Houston Oil. But there is no evidence to show that while the sugar stock was in the Forrest, Davis & MacDonald account, Egner had any interest in it, or that complainant repaid any part of the sum advanced by Egner to take the stock over. Of course, the

transfer was made with complainant's consent. It may have been a purchase by Egner from complainant, and in addition to the amount paid by Egner to Forrest, Davis & MacDonald, there may have been other considerations moving from Egner to complainant. It would seem that on the date of the transfer complainant had no equity in the sugar stock. It was not an active stock and its market quotation then was from 135 to 160 and a sale is reported the following day at 140. It was held by complainant's brokers as collateral security for a debt of $13,345.50, and the brokers may have called for more margin which complainant was unable to furnish, and Egner may have taken the stock off complainant's hands, rather than let the brokers sell complainant out at a loss. Egner paid 148¼ for the stock and the proceeds enabled complainant to balance his account with his broker. When Egner sold it April 8th, 1918, he sold at a loss. That sale gave Egner back what the stock had cost him less his loss on the transaction, and if he put part of what he realized on the sale into the purchase of one hundred shares of Houston Oil, I fail to see how complainant could have acquired any interest in the purchase. I digress somewhat to say that Egner's account with Clark, Dodge & Company was opened long prior to the date when he took over complainant's sugar stock, and it was continued to his death. Complainant claims no interest in any of the items shown on this account, other than Cuban-American Sugar and Houston Oil. This account shows many transactions, both of purchase and sale. Before and after Egner acquired the sugar stock he dealt extensively in Houston Oil, both by purchase and sale, and he carried a good credit cash balance. It seems impossible to say that the Houston Oil in question, having been charged against the general balance of his account, was not bought with the proceeds of some of his previous stock sales, or that the sales made by him of Houston Oil after April 8th, 1918, did not include the one hundred shares bought by him on that day. He bought as high as one thousand shares of this stock through this account in different lots and at his death had six hundred

shares remaining in the account. It is to be noted that the Cuban-American Sugar sold for $12,855.15, of which complainant claims that $6,212.50 was used to acquire one hundred and eighteen shares of Houston Oil, which leaves a balance of $6,642.65, as to which complainant makes no claim in this suit. If in some way he still owned an interest in the sugar stock after it has been transferred to Egner's account, and the ownership of such interest justifies a claim to one-half of the Houston Oil, it is strange that complainant makes no claim to the balance of the proceeds of the sale of the sugar stock.

"The further evidence on which complainant relies to prove this claim is the testimony of Mrs. Smith, who had been in his employ and who testified on direct examination that on one occasion she told Egner she was sorry for complainant because his business was poor, and that Egner replied: 'What has he got to worry about? Houston Oil is the best thing on the line,' and that she then said to Egner: 'You have some of that, have you, you and Mr. Millar?' and that Egner replied: 'Yes; we have one hundred shares with Clark, Dodge & Company.' She fixed this conversation as having occurred in 1913 or 1914. On cross-examination her version of the conversation was that she told Egner complainant was worried and that Egner then spoke of Houston Oil as being good and she said: 'Well, have you got any of that?' and he replied: 'Yes, Mr. Millar and I have one hundred shares with Clark, Dodge & Company.' She fixed another conversation with Egner on the subject of another lot of Houston Oil as having occurred in 1919. After the hearing at which Mrs. Smith testified was concluded, counsel for complainant realized that she had fixed her conversation with Egner as having occurred at least four years before he had bought the one hundred shares of Houston Oil, and she was recalled at a subsequent hearing to testify that she had been mistaken in the date and that the conversation, in fact, occurred in 1918 or 1919. This lapse in memory naturally casts doubt upon the accuracy of Mrs. Smith's recollection of what actually was said. As she appeared very familiar

with the details of complainant's other stock transactions, not only individually but with Egner, and she said she knew, in a general way, that complainant and Egner were interested in Houston Oil, it seems strange that she should not have known of his interest with Egner in these particular shares, and that she should have asked Egner the direct and personal question, whether he and complainant had Houston Oil. It is also strange that at the date Mrs. Smith finally fixed this conversation to have occurred, she should have stated to Egner that complainant was worried, because complainant claims that he was then interested in Houston Oil with Egner, not only as to the one hundred and eighteen shares in question, but also in one thousand shares of the same stock carried with other brokers (to which reference is hereafter made), and the market was steadily rising until the stock touched 176 late in 1919, from which it would appear that complainant could not have been worried as to Houston Oil. It is also strange that Egner, in speaking to her of Houston Oil, referred specifically to one hundred shares with Clark, Dodge & Company, and did not mention the larger number of shares he was carrying with the same concern, or the aforesaid block of one thousand shares. Complainant also relies on the evidence given by Mr. Mangin, who testified that some time in 1919 Egner told him that Houston Oil was a good prospect, and that he (Egner) and the complainant were interested in it; that Egner did not say in how many shares they were interested, but he did say that they had bought at some figure between 43 and 48 and that the stock would make them a lot of money; that Egner did not say he and Egner had bought jointly and did not name the broker through whom they had purchased. Two other witnesses, Messrs. Letterhouse and Carmichael, testified as to conversations between complainant and Egner, when all four were present, in which Egner said to complainant: 'Cheer up, we will all get rich on Houston,' but they never heard Egner say that he and complainant owned any of the stock jointly. At the time of the conversations related by Messrs. Mangin, Letterhouse and Carmichael, complainant

46

was speculating in stocks and ran several brokerage accounts, and when Egner said that he and complainant were interested in Houston Oil, and that 'we' would all make money out of it, it might have been a fact known to Egner that complainant himself had purchased some of the stock, as had Mangin, Letterhouse and Carmichael, and that when he used the word 'we' he was referring to separate holdings of himself, complainant, Mangin, Letterhouse and Carmichael. The result of this overlong review of the facts is that I cannot accept the evidence on the part of the complainant as sufficiently reliable or definite to fix a joint ownership of the one hundred and eighteen shares in question in complainant and Egner.

"Complainant's further claim is that he and Egner were interested as joint adventurers in two accounts carried with the brokerage firm of J. Robinson Duff & Company, the one known as 'E. F. Millar Special' and the other known as 'E. F. Millar No. 1.' He states the extent of his interest in the first account to be one-third, because another (Heller) was interested with complainant and him, and he states the extent of his interest in the other account to be one-half, because he and Egner were the only persons interested therein. He claims a proportion of the profits which would have been realized had the stocks in these accounts been sold, immediately prior to or after Egner's death, or for contribution from Egner's estate to the amounts lost by the accounts when they were closed out by the brokers.

"The proofs show that an account was opened with Henry Brothers, brokers, June 10th, 1918, in the name of 'E. F. Millar Special,' for which account one thousand one hundred and ten shares of Houston Oil and three hundred shares of International Paper were bought and one hundred shares of Houston Oil were sold, and that the account was closed May 15th, 1919, by the delivery of one thousand shares of Houston Oil and three hundred shares of International Paper to the brokerage firm of J. Robinson Duff & Company (afterward Duff, Freiday & Company). I conclude that the proofs show that Egner had some interest, undefined as to extent,

with complainant in the securities in this account. On May 15th, 1919, an account in the name of 'E. F. Millar Special' was opened with J. Robinson Duff & Company, to which the Houston Oil and International Paper were credited. On this same day another account was opened with J. Robinson Duff & Company in the name of 'E. F. Millar No. 1,' to which were credited certain securities received by that firm from an undisclosed source. No explanation is offered as to why, if Egner and complainant were joint adventurers in stocks, they should have opened two accounts on the same day with the same broker, in which to carry their joint dealings. There is no evidence that prior to the opening of the 'E. F. Millar No. 1' account, complainant and Egner were interested in any account bearing that title with any other broker, or that they were interested together in the stocks with which the account in question was opened, and I do not find any evidence that during the time such account ran, which was from May 15th, 1919, to February 5th, 1920, and dealt in the purchase and sale of many securities, Egner had any interest in it, and I therefore deny complainant's prayer for an accounting in connection with the 'E. F. Millar No. 1' account.

"But I do not find that when the 'E. F. Millar Special' account was opened with J. Robinson Duff & Company, Egner had an interest in the two stocks with which the account was opened. I cannot find, however, any satisfactory evidence that such interest continued to the date of his death, or that he had any interest in any of the various other securities bought and sold for such account. It appears that on May 23d, 1919, before any securities were bought or sold for the account, J. Robinson Duff & Company gave their check for $20,000 against the account, to the order of complainant, who endorsed it payable to the order of Egner, and that it was endorsed by Egner to and was cashed by Clark, Dodge & Company, and since there is no explanation of this transaction, the check may have been given in satisfaction of Egner's interest in the account. The account shows that the three hundred shares of International Paper were sold June

4th, 1919, and that one thousand shares of Houston Oil remained in it to February 6th, 1920, when they were closed out by the broker. To establish Egner's continued interest in the Houston Oil stock and his interest in other securities bought and sold for the account, complainant relies upon the testimony of his secretary, Mrs. Smith, who says that Egner gave many orders, through complainant's office, for the purchase and sale of stocks for an 'E. F. Millar Special' account. But there were accounts with that title with brokerage concerns other than J. Robinson Duff & Co., and she did not state whether any such orders were given after May 23d, 1919, and she did not designate any definite number of shares of any particular stock ordered purchased or sold by Egner for the 'E. F. Millar Special' account with J. Robinson Duff & Company. Complainant also relies upon the testimony of several witnesses to show that in and after May, 1919, Egner admitted an interest with complainant in the one thousand shares of Houston Oil, which admission would tend to show not only their joint ownership in that stock, but also, by inference, in the whole account, but in my opinion the witnesses failed to establish the fact. They were two vice-presidents of the Fidelity Trust Company, being business associates of Egner; two secretaries of Egner; three friends of Egner and complainant, with whom they frequently played golf; Egner's brother and complainant's secretary. These witnesses heard Egner speak of Houston Oil during the period complainant claims that he and Egner were jointly interested in it. Some of them heard Egner and complainant discuss the purchase and sale of many stocks, including Houston Oil, but none of them testified that Egner spoke of owning one thousand shares of Houston Oil, or that he stated that he had an interest in that number of shares with complainant, or in an account with J. Robinson Duff & Co. During the period in question Egner carried accounts with several brokers, and he was the owner of a large number of shares of Houston Oil, in which complainant had no interest, and complainant may have been carrying some of the same stock in another account. In discussing this

stock with complainant, or with others who also owned the same stock, in complainant's presence Egner spoke of the stock 'we' own, but it does not follow necessarily that he intended to refer to a joint ownership with complainant. Complainant points to the $20,000 check I have mentioned, given by J. Robinson Duff & Co., as evidence of Egner's ownership in the account in question, but there is no evidence to show the purpose for which complainant endorsed the check over to Egner, and it may have been given, as I have said, in satisfaction of Egner's interest in the account, or in pursuance of some other business transaction, or for one of a number of reasons which I might assume to be true, with as much justification as I have for accepting complainant's assumption. Assuming that there is evidence to show that complainant and Egner continued to be interested in the one thousand shares of Houston Oil down to Egner's death and thereafter and until the stock was sold by the brokers, that is not a fair reason for assuming that they were similarly interested in all the stocks carried in the 'E. F. Millar Special' account, and I would point out that the Henry Brothers' account shows that one thousand one hundred and ten shares of this stock were bought for $86,450 and one hundred shares were sold for $8,158.50, so that the remaining one thousand shares stood them in $78,291.50 when transferred to J. Robinson Duff & Company, and the account of the latter firm shows that they were sold February 6th, 1920, for $87,910, or a profit of $9,618.50 (less commissions and carrying charges), all of which went to the credit of complainant, and in that situation it would seem that it is complainant who should account and not Egner's estate.

"If complainant had established that Egner was interested in this 'E. F. Millar Special' account at the date of his death, it would be necessary for complainant to fix, not only the proportion of his own interest, but also the proportion of Egner's interest, because Egner's estate can be held to account only for profits or losses to the extent of Egner's interest· Complainant filed his proof of claim with defendant on or about October 25th, 1920, for 'one-third profit on

E. F. Millar Special account with the brokerage house of J. Robinson Duff & Company, $4,525.55,' and with the claim he sent a letter to defendant in which he said he claimed an interest in the account, 'which I think can fairly be put at one-third, as through my ability to get someone to carry it, I enabled Messrs. Egner and Heller to retain it.' Thus his claim was not made as a partner entitled to a definite percentage of profits, but as compensation for services rendered and he thought that one-third of the profits would be a fair charge to make. His letter is also a statement that a man named Heller was interested in the account with Egner. In the same letter he said, in further explanation of his claim: 'Upon going over the account I find the error was in overlooking the fact that Mr. Egner drew $20,000 from the account May 23d, 1919, so that instead of a loss of $6,000 there was really a profit of $14,000,' and accordingly he made his claim for approximately one-third of $14,000 profits. November 4th, 1920, he wrote defendant again, stating that to his surprise he had found that in 1918 $20,000 had been put into the account and that the withdrawal of that sum in 1919 'was simply getting their money back,' and therefore there were no profits to divide and he notified defendant that he withdrew his claim against the E. F. Millar Special account. The meaning of that letter appears to be that complainant knew that Heller was interested in the account with Egner and that Heller and Egner had got *their* money back, and also that complainant had discovered that his first impression that the account had lost $6,000 was correct; but he said nothing about sharing the loss or how it should be paid and he withdrew his claim for services. In paragraph 3 of his bill of complaint, filed December 1st, 1920, he says, speaking of this account, that it was maintained at a loss and that Egner was liable, as a partner, for one-half of the net losses sustained, and here he appears to disregard Heller's interest and to abandon his claim of one-third profits as compensation for services. On final hearing the complainant was asked if he claimed an equal interest with Egner in the 'E. F. Millar Special' account and he replied that he claimed

a half interest in Egner's interest and he stated that the other half interest belonged to somebody else, and he summed it up by saying: 'I have been claiming a half interest in whatever interest Mr. Egner had.' Thus it will be seen that complainant admits that someone else (presumably Heller) had an interest in the account, and while he fixes his own interest, somewhat indefinitely, at one-third or one-quarter of the whole, he has failed to show the proportion of Egner's alleged interest, and therefore it would be impossible to determine, if there were grounds for granting his prayer for an accounting, in what proportion Egner's estate should share in profits or losses. I deny complainant's prayer for an accounting as to the 'E. F. Millar Special' account with J. Robinson Duff & Company."

*Messrs. Demarest & Rugge,* for the appellant.

*Mr. Francis Lafferty,* for the respondent.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons stated in the opinion filed in the court below by Vice-Chancellor Fielder.

*For affirmance* — THE CHIEF-JUSTICE, TRENCHARD, PARKER, MINTURN, KALISCH, BLACK, KATZENBACH, CAMPBELL, HEPPENHEIMER, GARDNER, ACKERSON, VAN BUSKIRK, CLARK—13.

*For reversal*—None.